L. A. Davidson v. Commissioner. Virnie B. Davidson v. Commissioner
Davidson v. Commissioner
Docket Nos. 38526, 38527.
United States Tax Court
1953 Tax Ct. Memo LEXIS 106; 12 T.C.M. (CCH) 1080; T.C.M. (RIA) 53317; September 24, 1953
Clarence A. Bradford, Esq., 932 Buhl Building, Detroit, Mich., for the petitioners. John L. King, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined the following deficiencies in the income tax of the petitioners: Docket
No.
Year
Deficiency
L. A. Davidson
38526
1945
$5,738.58
1947
3,447.32
1948
6,291.55
Virnie B. Davidson
38527
1945
4,955.19
1947
3,376.06
1948
6,291.55
Issues presented for determination are the correctness of the respondent's action (1) in disallowing a portion of the deductions taken as depreciation for 1945, 1947 and 1948 by a partnership composed of the petitioners and operated under the name of L. A. Davidson, (2) in determining that the proceeds realized from the *107 sale of salvage materials in 1945 by the partnership constituted ordinary income, and (3) in determining that the proceeds realized from the sale of certain steel beams in 1948 by the partnership constituted ordinary income. General Findings of Fact A portion of the facts have been stipulated and are found accordingly. During the taxable years involved herein, and at the time of the hearing, the petitioners were residents of Lansing, Michigan. Each of the petitioners owned a one-half interest in a partnership operated under the name of L. A. Davidson. The income tax returns of the petitioners for the years in question and the returns of income of the partnership for said years were filed with the collector for the district of Michigan. The partnership was formed about 1924. During the years here involved and for many years prior thereto it engaged in a general heavy construction contracting business, including the building of roads and highways and railroad construction. Issue 1. Depreciation Findings of Fact In the conduct of its business the partnership used automobiles, trucks, pavers, graders, cement bins, cranes, drag-line excavators, and other items of construction *108 equipment. The partnership owned some of the equipment it used and it rented some. During the taxable years in question, as well as prior thereto, the partnership computed depreciation on the property owned by it on the straight line basis without first reducing the cost by an amount for estimated salvage. The following is a statement of the total number of items in which the partnership took depreciation, the total cost of such items, and the total depreciation deducted for the indicated years: Total
Total
number
depreciation
Year
of items
Total cost
deducted
1945
5
$ 35,942.98
$11,600.80
1946
14
72,280.19
16,851.14
1947
25
113,259.25
36,886.51
1948
47
188,776.51
63,360.44
In computing the foregoing amounts of depreciation the partnership used a life of three years for new and used automobiles, lives of two and three years for used trucks, and lives ranging from two to six years for other items of machinery and equipment. Aside from automobiles and trucks, the partnership's machinery and equipment had no further use in the business beyond the periods employed by the partnership in computing depreciation thereon. With rare *109 exceptions, the partnership was able to dispose of it only as junk and, since much of it had to be dismantled before being sold, only nominal sums could be realized from its sale. As a consequence it had no substantial salvage value. The following is a statement of items of machinery and equipment sold by petitioner during the years 1946 through 1949, the date of acquisition, cost, depreciation taken thereon by the partnership to the time of sale, depreciated basis, date of sale, and the gain: Deprecia-
tion taken
Depreci-
Date of
to date
ated
Item
acquisition
Cost
of sale
basis
Date of sale
Gain
27 E Paver *
June 1, 1934
May 14, 1946
$2,070.00
2-Compartment Bin with
Batcher *
June 1, 1930
May 14, 1946
1,260.00
Ford Hydraulic Dump
Truck *
June 15, 1942
Aug. 15, 1946
569.51
1941 Cadillac Sedan *
Dec. 17, 1940
Mar. 24, 1947
$ 925.00
1941 Chevrolet Coupe
Nov. 9, 1944
$ 870.00
$ 870.00
Mar. 6, 1947
875.00
Oldsmobile 2-Door Coupe
June 28, 1947
1,792.29
995.72
$796.57
Sept. 1, 1948
1,003.43
1946 Ford Sedan
May 2, 1946
1,128.80
1,128.80
Aug. 10, 1949
560.00
1947 Oldsmobile Sedan
Feb. 21, 1947
1,793.64
1,544.52
249.12
July27, 1949
1,000.88
*110 In determining the deficiencies for the years in question the respondent determined that 20 per cent of the cost of the partnership assets on which depreciation was taken represented the salvage value of such assets and, accordingly, reduced the depreciation deductions taken by the partnership for 1945, 1947 and 1948 by the amounts of $5,749.33, $14,417.42 and $20,905.49, respectively. Opinion There is no controversy between the parties as to the cost of the partnership assets on which depreciation was taken, nor as to the useful life of those assets. The disagreement between them is as to the correctness of the respondent's action in determining that the salvage value of those assets amounted to 20 per cent of their cost and in allowing depreciation based on only the remainder of their cost. Relying on the testimony of petitioner, L. A. Davidson, who has been connected with the contracting business for approximately 40 years, the testimony *111 of other witnesses and certain statements contained in a publication of the Associated General Contractors of America, Inc., all to the general effect that the salvage or scrap value of a contractor's equipment is usually insignificant, the petitioners urge that the respondent's determination of a scrap value amounting to 20 per cent of cost was erroneous and that the p artnership should be allowed the depreciation deductions taken by it for the years in question. The respondent contends that the substantial amount of gain realized by the partnership on the sale of a number of its assets, as set out in our findings, shows that under the partnership's method of taking depreciation the assets had substantial salvage values remaining after the partnership had fully depreciated them on its books and that his action was correct and should be sustained. Regulations 111, Section 29.23 (1)-1, provides that the proper allowance for depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the property, equal the *112 cost or other basis of the property. Respecting the allowance for depreciation, it was said in Terminal Realty Corporation, 32 B.T.A. 623, 629: "The annual allowance may be computed by dividing the cost of the property by the number of years of its estimated life. If the probable salvage value can be estimated, it should be first deducted from cost, but if it can not be reasonably estimated, adjustment may be made for it later. Some later adjustment may also be necessary to make up for errors in the estimate. A reasonable allowance is thus merely the equitable share of the expense of ultimate retirement of the plant assignable to each year." In view of what has been said above, it is clear that the question of salvage value is to be considered in determining the portion of the cost or other basis of property that is to be exhausted over the useful life of the property. Where the probable salvage value can be estimated, it should first be deducted from the cost or other basis of the property and the remainder exhausted over the estimated life of the property. If the probable salvage value can not reasonably be estimated, adjustment is to be made for it upon disposition *113 of the property by treating as income any net proceeds received for it. Examining the facts in the light of the foregoing we find that during the years 1946 through 1949 the partnership disposed of a total of six automobiles and trucks at substantial sums. Four items of this equipment had been fully depreciated by the partnership. The remaining items were disposed of at amounts substantially in excess of their depreciated bases. In view of the amounts received, we think it was apparent to the partnership that its automobiles and trucks would have substantial salvage values at the end of the period over which the partnership was depreciating them. Under these circumstances the petitioners have failed to show that the estimate of salvage made by the respondent was out of line. In fact the respondent's estimate appears to be conservative when compared with the amounts the petitioners were receiving for completely depreciated property of this class. The respondent's determination so far as it relates to the partnership's automobiles and trucks is sustained. Respecting the partnership's other machinery and equipment, the evidence shows that in May 1946 a paver and a bin, the cost of *114 which is not disclosed but which appear to have been wholly depreciated prior to 1944, were sold for substantial sums. However, these appear to have been the only sales of such machinery and equipment during the years 1944 through 1951. The evidence as to the partnership's experience with machinery and equipment of this character as a whole shows that it could be disposed of only as junk and that since much of it had to be dismantled before being sold it had no substantial salvage value. In this situation we do not think it could be said that the probable salvage value could be reasonably estimated. Consequently, the partnership was not required to reduce the cost of other basis of the machinery and equipment by probable salvage in computing depreciation thereon. However, if the partnership had been required to reduce its cost or other basis by an estimated salvage value, we would be unable on the record before us to sustain the respondent's determination of a salvage value of 20 per cent of the cost of the machinery and equipment. The respondent's determination as to this class of machinery and equipment is not sustained. Issues 2 and 3 Salvage materials and steel beams Findings *115 of Fact During 1943 the partnership, in performing a contract involving the removal of a railroad fill, was required to remove certain small gravel designated "pea gravel" which had been used in the construction of the fill. Since the gravel was useful for making fills, driveways, roadways, and the construction of sewer trenches, the partnership preserved it in a separate pile. On May 10, 1945, the partnership sold 11,100 cubic yards of the gravel for $12,210. At different times, commencing in May 1942 and ending on January 3, 1944, the partnership acquired 32,647 M.B.M. mixed hardwood timbers, which it sold on November 1, 1945, for $1,375.35. These timbers had been purchased by the partnership from a lumber company for use in the erection of a structure of some undisclosed type and at the time of sale by the partnership in 1945 could be used for the erection of a temporary structure or as supporting timbers. In the performance of a contract with the Michigan State Highway Department, the partnership constructed certain piles. In constructing the piles certain seamless steel tubing was used which became part of the piling. Certain other seamless steel tubing was used to pour *116 concrete into the tubing which became part of the piling. When the contract was completed the tubing used for pouring concrete, comprising 100 pieces, was removed. The tubing so removed could be used on a similar construction project. The 100 pieces of tubing removed from the job were acquired by the partnership prior to July 27, 1944, and on June 20, 1945, were sold for $3,761.06. The partnership contracted with the Michigan State Highway Department to build a railroad grade separation over a public highway. In the performance of the contract it was necessary for the partnership to build a temporary trestle for the use of the railroad during the period of construction of the grade separation. Upon completion of the grade separation the trestle was taken down and removed by the partnership. On September 13, 1945, the partnership sold 180 pieces of 8 inch by 10 inch firwood ties, formerly constituting part of the trestle for $540. The ties could be used for other jobs identical with that on which they had been used. They also could be used to block up buildings and for moving equipment. The ties were acquired by the partnership prior to March 23, 1944. On February 1, 1944, the *117 partnership acquired 23 steel I-beams at a cost of $1,605.71 and on September 18, 1948, sold them to an engineering company for $2,692.91, or for $1,087.20 more than it paid for them in 1944. The beams were used by the partnership as equipment on the Schaefer Road Grade Separation job, which was completed in 1944. In addition they were used by the partnership as equipment on various other construction jobs prior to their sale in 1948. On one occasion the partnership used the beams for supporting false work for a concrete bridge which it constructed. The beams could also be used to move cranes, brace sewer trenches, and construct temporary bridges. In determining the cost of a particular job, the cost of the material to be used, such as the hardwood timbers, ties, seamless steel tubing, gravel, and steel I-beams here involved, was included by the partnership as part of the cost of the respective jobs and was paid for by the party for whom the partnership performed the job. As a consequence the items set out above were acquired by the partnership as waste material or salvage from the various jobs and at no cost to it. The partnership did not deduct depreciation on any of the items *118 and did not advertise any of them for sale. In its returns for the years 1945 and 1948 the partnership reported the entire proceeds received from the sale of the above-mentioned respective items as gains from the sale of capital assets and treated 50 per cent of such proceeds as long-term capital gains. In determining the deficiencies involved for 1945 and 1948 the respondent determined that the proceeds received from such sales constituted ordinary income. Opinion The question for determination under these issues is whether the proceeds received by the partnership from the sale of pea gravel, hardwood timbers, firewood ties, seamless steel tubing and steel I-beams constituted gains from the sale of capital assets as defined in section 117 of the Internal Revenue Code[1] as the petitioners contend or were ordinary income as the respondent determined. *119 As pointed out in Merton E. Farr, 11 T.C. 552, affd. sub nom. Sloane v. Commissioner, 188 Fed. (2d) 254, section 117 is a statute of partial exemption and a taxpayer seeking its benefits must bring himself squarely within its terms and all fair doubts are to be resolved against him. Consequently, the question before us must be resolved in the light of that rule. Concededly the record fails to show any avowed purpose for which the pea gravel was preserved and held by the partnership. Since the gravel was useful for such construction purposes as making fills, driveways, roadways, and the construction of sewer trenches, we think it may fairly be concluded that it was held for use in the performance of such contracts as the partnership might obtain where such gravel could be used. So used, the gravel would become an integral part of completed jobs. In such a situation the gravel would appear to have been held by the partnership primarily for sale to customers in the ordinary course of its trade or business. Having been held for that purpose, it was not a capital asset within the provisions of section 117 of the Code. The petitioners contend that the partnership *120 had used the other items, namely, the hardwood timbers, the ties, the steel tubing and the I-beams, in the performance of contracts, that it continued to hold them for use in performing future contracts, and that accordingly those items constituted property used by the partnership in its trade or business and were capital assets within the provisions of section 117 (j). In this connection it is to be observed that under the partnership's method of operating it included such items in the cost of performing a contract when it determined the amount of its bid. As a consequence, when it performed a contract and collected therefor, it received payment for such items even though they were used as equipment in performing the contract and did not become an integral part of the completed job. By thus charging to, and collecting from, those for whom it did work for items of the character here involved, it appears that the partnership was, in effect, selling those items as a part of its completed jobs. Having once recovered their cost in that manner, the items thereafter had no cost basis to the partnership when recovered as waste or salvage. The record shows that the I-beams were acquired *121 by the partnership in 1944 and were used by it as equipment in performing the Schaefer Road Grade Separation job which was completed during that year. The record further shows that the beams were used by the partnership as equipment on various subsequent construction jobs prior to their sale in 1948. Although the partnership had recovered its cost of the beams and had recovered the beams as waste material or salvage, we think the foregoing showing is sufficient to establish that, at the time of their sale in 1948, the partnership held the beams for use as equipment in its business, and not as an item of inventory or as property held primarily for sale to customers in the ordinary course of its trade or business. Since the beams were of a character which was subject to an allowance for depreciation, we hold that they constituted a capital asset within the meaning of section 117 of the Code. With respect to the hardwood timbers, the ties and the steel tubing, the evidentiary situation is substantially different from that of the I-beams. In the case of the I-beams the evidence shows that they continued to be used in the business subsequent to their recovery as salvage and prior to their *122 final disposition. In the case of the hardwood timbers, the ties and the steel tubing there is nothing to indicate that any of them, or any portion of any of them, ever was used again in the business after having been recovered as salvage. Since the partnership had charged and collected for these items in the same manner as other items which became an integral part of completed jobs, and since it is not shown that the items in question, or any portion of any of them, subsequent to their recovery as waste or salvage were again used by the partnership prior to its ultimate disposition of them, we think it only fair to conclude that said items should be accorded the same classification as those which became an integral part of completed jobs, namely, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." As so classified, the items in question were not capital assets. Decisions will be entered under Rule 50. Footnotes
*. These items do not appear on the partnership's depreciation schedules for any of the years 1944 through 1947 and apparently their cost, which is not disclosed by the record, was fully depreciated by the partnership prior to 1944.↩
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Excdange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *↩